| | | |
|---|---|---|
| BERNHARD-THOMAS BLDG SYS, LLC, | : | |
| Plaintiffs, | : | |
| | : | 3:04-cv-1317 (CFD) |
| v. | : | |
| | : | |
| WEITZ CO., LLC | : | |
| and FEDERAL INS. CO. | : | |
| Defendants. | : | |

**MEMORANDUM OF DECISION**

## I. Introduction

Plaintiff Bernhard-Thomas Building Systems, LLC ("BT") brings this breach of contract action against The Weitz Companies, LLC d/b/a The Weitz Company–National ("Weitz") and the Federal Insurance Company.[1]  BT alleges that Weitz, the general contractor on the construction of a continuing care retirement community in Mystic, Connecticut (known as "the Stoneridge project") improperly terminated BT, the subcontractor for the framing, carpentry, walls, and roofing on the project.  BT alleges the termination was a breach of the subcontract agreement, and seeks damages of $1,947,129, along with interest and attorneys' fees.  Weitz contends that it properly terminated BT for cause, because BT was substantially behind schedule and unable to pay its own subcontractors.  Weitz brings a counterclaim to recover $1,287,604 in completion costs, plus interest and attorneys' fees.

---

[1] In April 2004, BT filed a mechanic's lien against the Stoneridge project, and Weitz substituted a bond in lieu of the mechanic's lien in the sum of $3,877,211.20, with Federal Insurance Company as surety.  The only claim against Federal Insurance Company in this action is Count One, for judgment on the bond pursuant to Conn. Gen. Stat. § 49–33 *et seq.*

After consideration of the testimony and exhibits presented at trial, the parties' proposed findings of fact, and closing arguments by counsel, the Court makes the following findings of fact and conclusions of law.

II.     **Findings of Fact**

1. Bernhard-Thomas Building Systems, LLC is a Connecticut limited liability company formed in 1998. BT manufactures wall panel systems through a process called "panelization." With panelization, as opposed to conventional stick frame construction, architectural plans for a structure are entered into a computer and entire walls are fabricated in a factory, then transported to the work site for installation.

2. In the spring of 2003, BT learned of the then-planned Stoneridge project. The Stoneridge project entailed the construction of a continuing care retirement community that consisted of five multi-story residential buildings (designated buildings A through E), a commons building, and a skilled nursing building. Buildings A through E are wood-framed structures totaling approximately 223,000 square feet. The skilled nursing building is steel studded structure of approximately 21,000 square feet. The commons building is a wood frame building of approximately 37,000 square feet.

3. The Weitz Company, an Iowa limited liability company, was the general contractor for the Stoneridge project.

4. Before entering into a subcontracting agreement with BT, Weitz visited the BT factory in Shelton, Connecticut, observed BT's work on dormitories being constructed at the University of Connecticut, and spoke with the general contractor on the University of Connecticut project about the quality of BT's work.

5. In August 2003 (before the final written contact was executed) BT began to render services and furnish materials for wall framing and installation, and related work such as flooring, roofing and window installation for the Stoneridge project. Weitz issued a Notice to Proceed to BT on August 19, 2003. On October 1, 2003, BT signed the contract.

6. Before Weitz signed the contract, Weitz required BT to secure payment and performance bonds to assure BT's satisfactory and complete performance of its obligations under the contract with Weitz. Although BT attempted to obtain such bonds, it was ultimately unable to do so and advised Weitz. In lieu of the bonds, Weitz allowed BT to post a $300,000 letter of credit in favor of Weitz. BT provided Weitz with the letter of credit issued by People's Bank on January 27, 2004. BT was required to deposit $300,000 with People's Bank as security for the letter of credit.

7. Weitz signed the contract on December 30, 2003. The delay in signing the contract was due to BT's unsuccessful attempts to obtain the bonds, and Weitz signed the contract when it appeared BT was able to obtain the letter of credit.

Schedule for BT's Work

8. A schedule for BT's work is attached to the contract as Exhibit E ("Exhibit E schedule"). The Exhibit E schedule was based on an estimate that Weitz would deliver the Notice to Proceed to BT on July 14, 2003.

9. Weitz in fact issued the Notice to Proceed approximately one month later, on August 19, 2003. On August 21, 2003, Jack Hinkle, the Project Supervisor for Weitz, sent a letter to Chet Dunican, then Director of Construction at BT. The letter stated that the updated schedule for the Stoneridge Project was attached, and that this revised schedule ("the August 21

schedule") was now the benchmark for contractually required performance.

10.  BT received Jack Hinkle's letter of August 21, 2003.  Weitz never received any communication from BT regarding the fact that although they received Jack Hinkle's letter, they did not have a copy of the attached August 21 schedule.[2]

11.  The August 21 schedule is updated from the Exhibit E schedule, and has a Notice to Proceed date of August 20, 2003.

12.  In addition to the August 21 schedule, Weitz also held meetings with subcontractors to update them on shorter-term schedules consistent with the August 21 schedule.  At these meetings Weitz issued "two-week look ahead schedules" that detailed what Weitz expected the subcontractors to be doing in the upcoming weeks.  Section 6.4 of Exhibit D to the contract states that these "interval schedules" should be used to coordinate work in the field, but do not modify the subcontractor's schedule obligations under the contract.  Section 6.4 also states the schedule will be periodically updated to reflect actual job progress.  The August 21 schedule was never formally revised or replaced, and remained the benchmark for contractually required performance throughout the project.

BT's Work During the Winter of 2003–2004

13.  BT fell substantially behind schedule during the winter of 2003–2004.

14.  By November 15, 2003, BT was behind on the roofing, siding and windows of building A.  BT was behind on the framing of building B.  BT was on schedule on building C, beginning to build wall panels.  BT was also behind on the framing of building D and the

---

[2] Harold Thomas, one of the co-owners of BT, testified at trial that he never received the August 21 schedule.

Commons building.

15.  By December 20, 2003, BT was behind on the building A roofing, siding and windows.  BT was also behind on the roofing and siding for buildings B and C.

16.  By January 17, 2004, BT was behind schedule on nearly every building.  The windows and siding of building A were required to be complete, but BT was still working on window installation in the A building.  The roof on building B was required to be complete, but BT was still working on the building B roof.  Although the C and D buildings were required to be complete by January, BT was still working on the framing on buildings C and D. Construction was to have begun on building E in late 2003, but BT had not yet begun framing building E by January 17, 2004.

17.  By mid-February, the schedule anticipated that buildings A through E, as well as the commons and skilled nursing buildings, would be complete.  BT had not completed work on any of the buildings by mid-February, and work continued on all the buildings through March.

18.  BT's work force, and the work force of the subcontractors BT had hired, increased through October and November 2003, began to drop in December 2003, increased in again in January 2004, peaked in early February 2004, and then began to decline through early March 2004.

19.  During this period, Weitz regularly communicated with BT regarding the fact that BT was behind schedule.

20.  For example, on November 7, 2003,  Seth Elgin, Project Manager for Weitz, sent a letter to BT owner Harold Thomas, which stated BT was three to four weeks behind schedule, and that BT would be responsible for any extra costs or damages resulting from the delay.

21.  On December 29, 2003, Seth Elgin sent another letter to Harold Thomas which stated that on Saturday December 27, 2003, BT had only a minimal crew on the Stoneridge site, and that on Sunday December 28, 2003, BT had no one on site.  Although BT had repeatedly stated more labor would be brought to the site to help meet BT's contractual schedule obligations, over the last weeks of December the number of BT workers had dwindled significantly.  Seth Elgin repeated this information in another letter to Harold Thomas on December 31, 2003.

22.  Weitz's payments to BT in early 2004 reflected the fact that BT was falling behind schedule.  To receive payment for its work, BT would submit to Weitz a monthly application for payment.  Seth Elgin would review the pay applications to make sure they reflected work that had actually been completed, and reduce them if necessary.  BT would then submit a revised application for payment, and Weitz would issue BT a check.

23.  BT originally submitted Application for Payment 6 in the amount of $66,870 for work completed through January 2004.  Elgin calculated the amount owed as $51,040, and BT submitted Application for Payment 6A in the amount of $51,038.  Weitz issued a joint check to one of BT's subcontractors, as well as a check to BT for $7,542.45.  BT never picked up its check, and it was later voided by Weitz.

24.  BT submitted Application for Payment 7 on February 20, 2004 in the amount of $559,209.  Seth Elgin made reductions to the application which he discussed with Larry Gordon, BT's new Director of Construction (and successor to Chet Dunican) which Gordon did not dispute.  Seth Elgin's revisions to Application Payment 7 indicate that BT was only entitled to $381,684.  BT never submitted a revised Application for Payment 7 before being terminated in early March.

Events in March 2004

25.  By the beginning of March 2004, BT was approximately three months behind the August 21 schedule.

26.  On March 3, BT terminated Bruce James, the on-site Project Manager for BT since the beginning of the project.

27.  On March 5, Larry Gordon asked Jack Hinkle and Seth Elgin if BT could receive progress payments every two weeks instead of once a month, as was previously agreed.  Gordon indicated that BT needed to be paid more frequently in order to pay its subcontractors.  Hinkle and Elgin told Gordon that Weitz would continue to pay BT monthly, as set forth in the contract, instead of every two weeks.

28.  On the morning on March 8, representatives of BT's subcontractors spoke directly with Seth Elgin of Weitz, and said Larry Gordon had told them that if they wanted to be paid for their work, they should talk to Weitz directly.

29.  BT had delivered wall panels to the construction site that morning on a large truck. After unloading the panels, BT crew began to load several of their ladders and a compressor onto the truck for removal from the site.  Hinkle and Elgin believed that BT was beginning to demobilize from the site.  Hinkle told the truck driver not to leave, closed the gate to the construction site, and called the police.  He told Charles Boyce, Assistant Superintendent for BT, that all of BT's personnel were to leave the job immediately and take only their personal belongings.  Hinkle then seized all of BT's material and equipment on site.

30.  At 11:01 a.m. on March 8, Jack Hinkle faxed Harold Thomas a Notice of Default giving BT 48 hours notice to cure the default, pursuant to Section 11.1 of Exhibit D to the

contract.  Weitz communicated to BT that in order to cure the default, BT would have to submit a

plan demonstrating how it would cure the default and meet the schedule for the project.  Harold

Thomas understood that Weitz wanted a plan from BT in response to its letter.

31.  At approximately 12:15 p.m. on March 8, Seth Elgin sent a letter to Harold Thomas

stating that because BT has begun to demobilize the project by removing equipment and

materials, BT was in default of the contract.

32.  On the afternoon of March 8, BT's counsel sent Weitz a letter offering to submit the

dispute to non-binding mediation, claiming that the proposal was pursuant to Section 10.1 of

Exhibit D to the contract.  That same day, Larry Gordon sent a letter to Seth Elgin stating BT

would like to settle its claims with Weitz and complete the Stoneridge Project.

33.  On March 10, BT's counsel faxed and mailed a letter to Weitz's counsel reiterating

that  BT was ready, willing and able to complete the Stoneridge Project.  However, BT did not

propose concrete, credible steps to cure the default and meet the schedule for the project.

34.  Also on March 10 at 10:48 a.m., Weitz faxed and mailed a letter to BT asserting that

the 48 hours had expired and terminating BT's work on the Stoneridge Project.

35.  BT performed no further work on the Stoneridge Project after March 8, 2004.

36.  In April 2004, Harold Thomas executed a mechanic's lien in the amount of

$3,101,769 in favor of BT, and the lien was subsequently filed on the land records in the Town of

Stonington.  Weitz later substituted a surety bond from Federal Insurance Company for the

mechanic's lien.

<u>Weitz's Costs</u>

37. After BT was terminated, Weitz hired BT's subcontractors directly. Weitz began to pay the subcontractors utilizing the funds from the BT letter of credit as well as its own funds. The subcontractors completed BT's scope of work, and Weitz was able to substantially complete the Stoneridge Project on time. As a result, Weitz did not incur any stipulated damages for delay pursuant to its contract with the owner.

38. The original Weitz/BT contract amount was $4,380,775. The contract outlined a process by which BT or Weitz could submit changes to the BT scope, and the contract sum would be reduced or increased accordingly. The change orders to the contract—both those signed by BT before their termination and those that were pending and unsigned at the time of BT's termination—total $107, 835 (reflecting an increase in scope and therefore a larger contract price). Therefore, the amended contract amount between Weitz and BT is $4,488,610.

39. As of March 8, 2004, Weitz had paid BT $2,319,783.

40. Weitz incurred $3,756,431 of additional costs to complete BT's scope of work under the contract. Weitz used additional change order forms to document the costs of completing the BT scope.

41. Thus, the total amount expended by Weitz toward the BT scope was $6,076,214 ($2,319,783 paid to BT, plus $3,756,431 in additional costs to complete BT's scope).

42. Subtracting the amended contract amount of $4,488,610 from Weitz's total amount spent leaves a balance of $1,587,604. Applying the $300,000 from the letter of credit to this amount results in $1,287,604 in net completion costs to Weitz.

**III.    Conclusions of Law**

1.  This case is governed by Connecticut law.  Connecticut General Statue § 42-158m requires that Connecticut law apply to the adjudication of contractual issues that arise from the performance of work on a construction site in Connecticut.  The parties do not dispute that Connecticut law applies.

Breach of Contract (Counts Two and Three, and Weitz's Counterclaim)

2.  The contract required BT to "meet or better the durations established in the Contractor's Schedule," and to "provide sufficient crews . . . to maintain or improve on the Contractor's Schedule."  Section 6.4 of Exhibit D to the contract.

3.  The contract also required BT to make timely payments to its subcontractors.  Section 3.8 of Exhibit D to the contract.

4.  By March 8, 2004, BT was in breach of these provisions of the ontract.[3]

5.  Section 11.1 of Exhibit D to the contract provides that Weitz may terminate BT for cause.  Section 11.1 states in relevant part:

> If the Subcontractor fails or neglects to carry out the Subcontractor's Work in strict compliance with the Subcontract Documents or is otherwise in default of any of its obligations under the Subcontract Documents, and fails to commence and continue correction of such default or neglect with diligence and promptness, the Contractor may, after 48 hours following delivery to the Subcontractor of written notice thereof and

---

[3] BT argues that it could not have been in breach of the schedule provision of the contract, because it was Weitz that did not comply with Section 6.4 because Weitz never updated the schedule to reflect actual job progress.  However, Weitz complied with Section 6.4 by issuing short-term "look ahead" schedules at meetings with its subcontractors approximately every two weeks.  These meetings, along with Weitz's frequent communications to BT during the winter of 2003–2004 that it was behind schedule, kept BT apprised of what work was expected. The Court finds that the lack of a formally revised schedule to reflect actual job progress did not excuse BT from its obligations to meet the durations established in the schedule.

without prejudice to any other remedy the Contractor may have . . . terminate the Subcontractor's continuing performance under the Agreement.

6. Weitz terminated BT for cause because BT was behind schedule and unable to pay its subcontractors on a timely basis. Jack Hinkle's impression that BT was demobilizing on March 8 was not the only basis for BT's termination.

7. Weitz properly terminated BT for cause. After Weitz gave BT 48 hours notice on March 8, Weitz was not required to accept BT's offer of mediation, which BT made that afternoon. Section 11.1 does not mention any mediation requirement. Section 10.1 of Exhibit D to the contract is the provision that governs dispute resolution between the parties. That section provides that in the event of any dispute, the parties shall meet within five days following receipt of written notice of such a dispute. Since the 48-hour notice provision of Section 11.1 was set to expire before the five-day notice provision of Section 10.1, Weitz was not contractually obligated to accept BT's mediation proposal. BT did not satisfactorily demonstrate to Weitz that it would cure the default and meet the project schedule.[4]

---

[4] BT suggests another reason it was not properly terminated for cause is Weitz did not provide BT with the full 48-hour notice period. The notice of default was faxed to BT on March 8 at 11:01 a.m. Weitz then sent a second letter at approximately 12:15 p.m. stating that because BT has begun to demobilize the project by removing equipment and materials, BT was in default of the contract. Despite this letter, Weitz nevertheless appeared to have intended to abide by the 48-hour notice provision. On March 10 at 10:48 a.m., 47 hours and 47 minutes after the original notice was faxed, Weitz faxed another the termination notice to BT stating the 48-hour period had expired. By the morning of August 10, it was clear that BT was not attempting to submit a credible plan to meet the schedule, and was instead waiting for Weitz to accept its offer of mediation. Therefore, the fact that Weitz faxed the notice of termination a few minutes early does not constitute a breach of contract. Waiting an additional 13 minutes would have been futile, and Weitz may be "excused from performing a futile act." Wolff & Munier, Inc. v. Whiting-Turner Contracting Co., 946 F.2d 1003, 1009 (2d Cir. 1991) (applying New York law, holding that contractor need not have complied with two-day notice provision when subcontractor had no intention of completing its work); see also, Luttinger v. Rosen, 316 A.2d 757, 758 (Conn. 1972) ("[T]he law does not require the performance of a futile act.").

8.  Because Weitz properly terminated BT for cause, Section 11.4 of Exhibit D to the

contract governs the damages Weitz is entitled to recover in this action.  Section 11.4 provides in

relevant part:

> Upon termination of the Subcontractor's continuing performance under the Agreement
> for cause . . . [t]he Contractor shall apply any unpaid balance of the Subcontract Sum to
> pay for such completion costs . . . In all such events, if the unpaid balance of the
> Subcontract Sum exceeds the costs of completing the Subcontractor's Work together with
> interest on such costs and together with any offsets and deductions available to the
> Contractor, such excess shall be paid to the Subcontractor.  However, if such costs,
> interest, deductions and offsets exceed such unpaid balance, the Subcontractor or
> Subcontractor's surety shall pay the difference to the Contractor upon demand.

9.  Weitz is entitled to damages to the extent its completion costs exceed the amended

contract amount, plus interest.  Weitz is entitled to damages in the amount of $1,287,604.  (See

Findings of Fact # 40–43.)

10.  BT argues that it was not compensated for work performed and materials delivered

since Weitz's payment of Application for Payment 5A, and seeks damages of $1,947,129.  Even

if the Court were to determine that BT's damages analysis is credible, any amount owed to BT

for uncompensated materials and services would increase Weitz's damages amount dollar for

dollar.  Under the method for calculating damages outlined in Section 11.4 of the contract, Weitz

is entitled to the difference between what it expended to complete BT's scope of work, and the

amended contract amount.  If Weitz had paid BT more in the spring of 2004, Weitz's costs to

complete the scope would be higher, and consequently so would its damages amount.[5]

---

[5] For example, BT argues it is entitled to payment for the value of labor and materials it
provided from February 20, 2004 to March 8, 2004, a value BT calculates as $129,740.
Assuming Weitz paid BT for that labor and those materials prior to BT's termination, Weitz's
overall expenditure on the BT scope would have increased by $129,740.  Since Weitz's
completion costs would have then exceeded the amended contract amount by an additional
$129,740, its damages award would also increase by $129,740.  In other words, any money BT

11. The Court finds for the defendant Weitz on Counts Two and Three, and for Weitz on its Counterclaim.

<u>Judgment on Bond pursuant to Conn. Gen. Stat. § 49–33 *et seq.* (Count One)</u>

12. The purpose of a mechanic's lien is to give a party who furnishes materials or services in construction the security of the property for the payment of his claim. <u>See</u> <u>Rollar Construction & Demolition, Inc. v. Granite Rock Associates, LLC</u>, 94 Conn. App. 125, 129 (2006). A surety bond may be substituted for a mechanic's lien pursuant to Conn. Gen. Stat. § 49-37.

13. Because the Court finds BT was terminated for cause, and BT is not entitled to recover damages under the contract, it necessarily follows that BT may not recover on the bond substituted for its mechanic's lien. <u>See</u> <u>D'Angelo Development and Const. Corp. v. Cordovano</u>, 995 A.2d 79, 93–94 (Conn. App. 2010) (affirming trial court's decision that the party not entitled to costs under a contract was not entitled to recovery on the bond substituted for a mechanic's lien).

14. The Court finds for the defendants Weitz and Federal Insurance Corporation on Count One.

<u>Breach of the Covenant of Good Faith and Fair Dealing (Count Four)</u>

15. "Every contract carries an implied covenant of good faith and fair dealing requiring that neither party will do anything that will injure the right of the other to receive the benefits of the agreement." <u>Habetz v. Condon</u>, 618 A.2d 501, 505 (Conn. 1992). Connecticut courts have

---

did not receive from Weitz in the spring of 2003 is money that BT need not now reimburse to Weitz as part of this judgment.

held that to constitute a breach of the covenant of good faith, the defendant's acts must have been taken in bad faith. See, e.g., Alexandru v. Strong, 837 A.2d 875, 883 (Conn. App. 2004). Bad faith implies actual or constructive fraud, or a neglect or refusal to fulfill some contractual obligation, prompted not by an honest mistake but by some interested or sinister motive. It means more than mere negligence; it involves dishonest purpose. Habetz, 618 A.2d at 504 (quoting Black's Law Dictionary (5th Ed. 1979)). BT claims Weitz took the following acts in bad faith: excluding BT from the Stoneridge site on March 8 and terminating BT; refusing BT's invitation to mediation; reducing BT's Application for Payment 7; and redeeming BT's letter of credit. There is no evidence that Weitz took these actions with a dishonest purpose. First, Weitz terminated BT for cause, because BT was at least three months behind the schedule and failing to pay its subcontractors on time. Second, Weitz was not contractually obligated to accept BT's offer of mediation, because it had already given BT a notice of default pursuant to Section 11.1. Third, Weitz reduced Application for Payment 7 just as it had reduced earlier pay applications, and Larry Gordon concurred with some of Seth Elgin's reductions. Finally, Weitz was entitled to redeem BT's letter of credit to cover the costs it incurred to complete BT's scope. The Court finds for the defendant Weitz on Count Four.

### Unjust Enrichment (Count Five)

16. "Unjust enrichment applies whenever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract. . . . Indeed, lack of a remedy under the contract is a precondition for recovery based upon unjust enrichment." Gagne v. Vaccaro, 766 A.2d 416, 424 (Conn. 2001).

17. Because BT had an adequate remedy under the contract, it may not also recover

under the equitable theory of unjust enrichment. The Court finds for the defendant Weitz on Count Five.

## IV.     Conclusion

The Court finds for the defendants on all Counts. Weitz is entitled to damages of $1,287,604, plus interests, costs and fees pursuant to Sections 11.4 and 12.1 of the contract. Weitz may file a claim for prejudgment interest, attorney's fees and costs within two weeks of the date of this ruling. Opposition may be filed within one week after the date such a claim is filed.

SO ORDERED this 16th day of August 2011, at Hartford, Connecticut.


 /s/ Christopher F. Droney
**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**